**CONSOLIDATED GAS SUPPLY CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Public Service Commission of the State of New York,/R Intervenor.**

**No. 80–1219.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1981.

Decided July 10, 1981.

John E. Holtzinger, Jr., Washington, D. C. (John T. Stough, Jr., Karen B. Pancost, Morgan, Lewis & Bockius, Washington, D. C., David E. Weatherwax, Philip L. Jones, Consolidated Gas Supply Corp., Clarksburg, W. Va., on brief), for petitioner.

Stephen R. Melton (Robert R. Nordhaus, Gen. Counsel, Jerome Nelson, Sol., Norma J. Rosner, Federal Energy Regulatory Commission, Washington, D. C., on brief), for respondent.

Dennis Lane, Washington, D. C. (Richard A. Solomon, Wilner & Scheiner, Peter H. Schiff, Washington, D. C., on brief), for intervenor The Public Service Commission of the State of New York.

Before HALL, PHILLIPS and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Consolidated Gas Supply Corporation (Supply) petitions for review of a rate setting by the Federal Energy Regulatory Commission (Commission). Specifically challenged are the Commission's approval of 12.5% as a reasonable and just rate of return on common equity for two rate increase filings and the Commission's decision to credit the cost rate for long-term debt for the amortization of discounts realized in

reacquiring 25-year debentures from 1953 to the test years, 1978–79. *Consolidated Gas Supply Corp.*, Opinion No. 7 (Jan. 11, 1980) (Docket Nos. RP79–52, RP79–22). Concluding that the Commission's findings are supported by substantial evidence and that the end result is neither unjust nor unreasonable, we affirm.

## I

Supply is one of eleven wholly-owned subsidiaries of Consolidated Natural Gas Company (Natural), a public utility holding company. This case arises from two rate increase notices filed by Supply with the Commission. Docket No. RP78–52 originally was filed on March 31, 1978 and became effective on July 1, 1978; Docket No. RP79–22 was filed on December 29, 1978 and became effective on July 1, 1979.[1] The increased rates were collected subject to refund pending decision. The two dockets were consolidated and most issues resolved by settlement. The parties stipulated, however, that the proper rate of return for both dockets should be adjudicated and that record evidence in two earlier Supply rate proceedings would be incorporated into this record.[2]

The Administrative Law Judge (ALJ) first adopted the capital structure of the parent, Natural, as a substitute for Supply's capitalization. Supply had furnished its parent's financial data as part of its rate filings made pursuant to 18 C.F.R. § 154.-63(f) because Natural obtains all Supply's debt and equity capital.[3] The ALJ noted that all parties agreed to use Natural's capital structure because Supply's capital which is controlled by Natural is not a product of arms-length bargaining in the marketplace and Natural could manipulate Supply's capitalization to benefit the integrated corporate enterprise at the subsidiary's expense. The ALJ also noted that the Commission Staff witness (Staff) and an intervenor, the Public Service Commission of the State of New York questioned using Natural's common equity ratio because they found Supply to be less risky than Natural. Where the risks of the subsidiary are significantly different from those of the parent, the Commission has stated that a hypothetical capital structure based on the capitalization of independent companies with comparable risks and more reflective of the subsidiary's risks should be used. *Kentucky West Virginia Gas Company*, Opinion No. 7 (Feb. 16, 1978) (Docket No. RP73–97). But no party proposed a more appropriate hypothetical capital structure and because adjustment for the differences in risk between Supply and Natural might be made in determining the return on common equity, the ALJ adopted Natural's capital structure as recommended by Staff.

In support of its proposed rates of return, Supply presented three expert witnesses who studied Supply and Natural through earnings-price ratios, market-to-book ratios, and discounted cash flow (DCF) analyses—market-oriented techniques based on Natural's financial data. Supply's witnesses also compared Supply and Natural with other regulated (gas and nongas) and nonregulated companies and presented statistics on

---

1. The rates in Docket No. RP79–22 were superseded on February 1, 1980, by rates filed in Docket No. RP80–61. (Jt.App. at 65.)

2. The parties agreed to resolve all issues pending before the Commission in rate proceedings for Supply in Docket Nos. RP73–107, RP74–90, RP75–91, RP77–7, and RP77–140. Evidence in the latter two dockets was incorporated in the record for Docket Nos. RP78–52 and RP79–22.

3. 18 C.F.R. § 154.63(f) (Statement F(1)) provides in pertinent part:
   Rate of return claimed. This statement shall show the percentage rate of return claimed and the general reasons therefor.[2]

2 Where any component of the capital of the filing company is not primarily obtained through its own financing, but is primarily obtained from a company by which the filing company is controlled, as defined in the Uniform System of Accounts, then the data required by those statements shall be submitted with respect to the debt capital, preferred stock capital and common stock capital of such controlling company or any intermediate company through which such funds have been secured.

general capital market conditions. For Docket No. RP78–52, Supply's witness recommended a return on common equity of 14.5% to 15.5% and an overall return of 11.20% to 11.72%. For Docket No. RP79–22, Supply's witness recommended a return on common equity of 15.0% and an overall return of 11.84%.

The one Staff witness examined data for Supply, Natural, other Natural subsidiaries, and other gas distribution and pipeline companies. Staff also analyzed general money market conditions and introduced a list of allowed returns in seventeen recent rate cases which included both initial decisions by ALJs and final Commission orders. For Docket No. RP78–52, Staff recommended a return on common equity of 12.0% and an overall return of 9.93%; for Docket No. RP79–22, he recommended a return on common equity of 11.75% and an overall return of 9.92% in Docket No. RP79–22.

The ALJ decided that the two dockets could be considered together because the data overlapped and the time periods were contiguous. He then described Staff's studies in some detail and noted they contained simple errors in computation and interpretation. These errors and various references to nonrecord evidence detracted from the weight to be given to Staff's recommendations. An even more serious fault, however, lay in Staff's failure "to articulate the logic upon which his recommended return was based." (Jt.App. at 29.) The ALJ found that Staff's recommendations were not supported by credible record evidence and concluded that they were not entitled to great weight.

The ALJ also described in some detail the market-oriented studies presented by Supply's witnesses. He questioned the studies and the recommendations based on them and ultimately rejected the presentations. Supply's proposed returns were higher than those granted by the Commission in recent cases and higher than those of other natural

gas pipeline companies.[4] More importantly, the record evidence demonstrated that Supply's risks differed from those of the Natural system as a whole. Natural had invested heavily in imported liquid natural gas from Algeria, in expanded gas exploration in the United States, and in future coal gasification projects—all high risk activities necessarily reflected in Natural's cost of capital. Supply was engaged in the same business activities as its parent (gas production storage, transmission, and distribution), but its production risks were passed on to customers immediately through its cost of service tariffs. Thus, Supply's overall risk was similar to that of a natural gas pipeline engaged in transmission and sale, not one engaged primarily in production, and consequently, Supply's enterprise was less risky than Natural's. On the record presented, the ALJ found that he could not ascertain precisely the extent of the risk differences between Supply and Natural. Supply, however, had the burden of proving that its risks were substantially similar to Natural's risks, and it had failed to carry this burden. Since the ALJ's task was to determine a rate of return for only the jurisdictional entity, Supply, he rejected Supply's market studies based on Natural's financial data because they did not allow for the risk differences between parent and subsidiary.

Despite rejecting all presentations, the ALJ decided that the underlying data presented was sufficient for him to establish a reasonable rate of return on common equity. As a starting point, he examined Staff's list of allowed returns in seventeen recent rate decisions covering 1973–77. The returns allowed ranged from 11.75% to 14.0%. The ALJ then adjusted this range by referring to prevailing market conditions. He set a lower limit of 12.0% on the zone of reasonableness because the prime interest rate at the time of the hearings in March 1979 was 11¾% and the interest rate

4. The ALJ also found specific problems with the studies: *inter alia*, the earnings-price ratios provided only a rough estimate of the cost of capital, the market-to-book ratios were distorted because Natural could artificially depress its stock price by retaining earnings rather than declaring dividends, and the DCF analyses were based on inflated earnings which included monies subject to refund.

on government securities was roughly 9%. The ALJ set 14.0% as the upper end of the zone of reasonableness by relying on Staff's perception that natural gas pipelines have lower business risks than unregulated industrial companies which operate in a competitive market and industrials earned an average of 14.0% to 14.1% in 1976–77.

The ALJ next found that a fair rate of return for Supply would be at the lower end of the 12–14% zone because it did not face the same risks as an average natural gas pipeline. He noted four factors indicating this lower risk: (1) Natural had better gas supplies than the average Major A & B Pipeline and this should inure to Supply's benefit; (2) the agreed-upon capital structure—Natural's capitalization—showed unusually high equity ratios of 53.8% for Docket No. RP78–52 and 56.1% for Docket No. RP79–22 and this thick equity cushion lessened financial investment risks; (3) Supply's downward trend in sales apparently had stopped and Natural affiliates had added retail customers which should increase Supply's sales; and (4) Supply did not have particularly high future capital needs.[5] The ALJ found a return on equity of 12.5% was just and reasonable for both dockets and would yield the following overall returns:

RP78–52

|  | Amount | Ratio | Cost | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $ 710,082,000 | 43.2% | 7.26% | 3.14 |
| Preferred Stock | 50,000,000 | 3.0 | 10.96 | .33 |
| Common Equity | 885,750,000 | 53.8 | 12.50 | 6.72 |
|  | $1,645,832,000 | 100.0% |  | 10.19 |

RP79–22

|  | Amount | Ratio | Cost | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $ 680,400,000 | 40.9% | 7.30% | 2.99 |
| Preferred Stock | 50,000,000 | 3.0 | 11.26 | .34 |
| Common Equity | 934,600,000 | 56.1 | 12.50 | 7.01 |
|  | $1,665,000,000 | 100.0% |  | 10.34 |

(Jt.App. at 50.) Refund of excess collections was ordered. *Consolidated Gas Supply Corp.* (July 3, 1979) (*appended to* Opinion No. 70).

On January 11, 1980, the Commission issued its opinion No. 70 affirming in part and modifying in part the ALJ's decision. The Commission affirmed the use of Natural's capital structure instead of Supply's actual capitalization, noting that this was consistent with past Commission practice.[6] The Commission also held that the ALJ correctly gave little weight to Staff's recommendations and rejected Supply's presentations because they failed to account for the risk differences between Supply and Natural.[7] Further, the ALJ properly found that Supply's enterprise is less risky than Natural's.

The Commission decided, however, that the ALJ should have treated the two dockets separately because of the increase in interest rates and continued inflation in 1979 and Supply's increased equity ratio in

5. The ALJ noted that Natural apparently expected no undue demands by its subsidiaries for outside funds because Natural had financed its subsidiaries' capital improvements for the past 20 years without issuing any stock to the public and it had no plans to sell additional stock. Further, Natural had a substantially reduced construction budget for 1979.

6. *See Consolidated Gas Supply Corp.*, 52 F.P.C. 454, 505 (1974).

7. The Commission did not comment on the ALJ's other criticisms of Supply's evidence. *Consolidated Gas Supply Corp.*, slip op. at 8 n.5 (Jt.App. at 10).

Docket No. RP79–22. Turning to the first docket, No. RP78–52, the Commission thought it preferable in framing an initial range of returns to use only final Commission orders issued since 1977 setting allowed returns on equity for natural gas pipeline companies. The Commission did not specify what orders it examined, i. e., only the five final orders on Staff's submitted list or all final orders up to the date of its opinion,[8] but it found that allowed returns fell largely within the 12% to 14% range. The lower limit of 12.0% was confirmed by the yearly average yields on Aaa rated public utility bonds and the upper end by the composite return on equity for more risky industrials of 14–14.1% in 1976–77 and 14.7% in 1978.[9]

The Commission also found 12.5% was a reasonable return for Docket No. RP78–52 in light of the four factors emphasized by the ALJ and would yield an overall rate of return of 10.19%. For Docket No. RP79–22, the Commission decided that the findings for the other docket were fully applicable except that the effects of inflation on interest rates in 1979 and Supply's increased equity ratio must be considered. The Commission concluded that the increase in interest rates was offset by the increase in Supply's equity ratio and, therefore, 12.5% was also just and reasonable for Docket No. RP79–22 and would yield an overall rate of return of 10.34%.

## II

Our role in reviewing the Commission's decision is narrow. Section 19(b) of the Natural Gas Act provides that Commission findings "if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b). In addition, we must defer to the Commission's regulatory expertise. We may not reject an allowed rate which falls within a "zone of reasonableness," *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88

S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968), and "[i]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). The Supreme Court has more specifically expressed the responsibilities of a reviewing court:

> First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

*Permian Basin*, 390 U.S. at 791–92, 88 S.Ct. at 1372–73.

Under these standards, we must affirm. We conclude that the Commission properly assessed the riskiness of investment in the jurisdictional entity, Supply, and rejected those presentations which failed to account for the risk differences between Supply and Natural. It next established an appropriate zone of reasonableness by using allowed returns for other natural gas pipeline com-

---

**8.** The Commission did refer to its recent Order No. 31, *Determination of Incentive Rate of Return, Tariff, and Related Issues* (June 8, 1979) (Docket No. RM78–12), where it had surveyed rate cases (mostly settlements) during 1977, 1978, and early 1979. Most allowed returns fell between 12% and 14%.

**9.** The data for industrials came from *Business Week* articles in 1978. The Commission judicially noticed the Nov. 20, 1978 issue which Staff had failed to introduce into the record.

panies and validated that range by reference to independent market factors. The Commission then weighed individualized business factors—favorable gas supplies, a thick equity cushion, additional retail customers, and usual future capital needs—in placing Supply within the zone. After examining the record as a whole, we affirm the Commission's conclusion that a 12.5% return is fair and reasonable to investors. There is substantial evidence to support the Commission's findings, the Commission properly exercised its discretion and expertise in deciding which factors are to be accorded significance, and the end result falls within a zone of reasonableness.

We are concerned, however, with two aspects of the Commission's decision. First, the Commission adopted Natural's financial structure as a substitute for Supply's capitalization even though it concluded that Supply is less risky than Natural. The Commission then used this risk difference, which on the record presented could not be ascertained with precision, both to reject Supply's market-oriented studies and to set Supply's rate of return on common equity at the lower end of the 12–14% zone. Where the subsidiary is wholly financed by the parent, the Commission has stated that it must impute a capital structure to the subsidiary. The Commission looks first to the risks facing parent and subsidiary. If the risks are similar, the consolidated capital structure is imputed to the subsidiary; but "[w]hen the risk profile of the parent and subsidiary are significantly different, we see no alternative to postulating a hypothetical capital structure for the subsidiary by referring to the average capital structure for comparable independent firms." *Kentucky West Virginia Gas Co.*, slip op. at 13. In this case, the Commission has not said whether the risks are significantly different, but we can only assume that the Commission considered them to be since it relied upon perceived differences of some degree in rejecting Supply's presentations and in setting the final rate of return. Under the Commission's own suggested methodology, the proper course would have been to develop a hypothetical capital struc-

ture for Supply, particularly when the Commission did not and admittedly could not quantify the risk differences on the record presented. We consequently are troubled by the Commission's failure to establish a capital structure reflective of Supply's circumstances and by its failure to do more than generally assess the risk differences. In this case, however, the parties agreed to use Natural's capitalization and they did not propose an alternative structure; Natural's structure was used in prior rate determinations; adjustments can be made; and Supply failed to carry the burden of showing that both its and Natural's risks are similar. Under these circumstances, we are not prepared to find in this apparent departure from approved methods administrative error requiring judicial correction.

Second, the Commission's use of unspecified final orders in framing a range of allowable rates disturbs us. The Commission referred only to orders issued since 1977 setting returns on equity for natural gas pipelines companies; the Commission did not identify the orders, the time periods involved, or whether the companies had comparable risks to Supply. Reasoned review accordingly is difficult. *Permian Basin*, 390 U.S. at 792, 88 S.Ct. at 1373; *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). We would have very serious doubts about the manner in which the zone was set if the Commission had not validated it by reference to independent market factors such as bond yields and returns for industrials and if it were to serve as more than a range. Mindful, however, that "[s]tatutory reasonableness is an abstract quality represented by an area rather than a pinpoint," *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951), we find no reversible error in the Commission's determination of a zone of reasonableness. Natural gas pipeline companies clearly are a comparable group to be used in setting up a zone and referring to Commission precedent in setting a rate of return has been judicially approved as a means of insuring that the allowed rate

will attract capital and permit comparable earnings under *Hope Natural Gas*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, and *Bluefield Water Works & Improvement Co. v. Public Service Commission of the State of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). *See Consolidated Gas Supply Corp. v. FERC*, 606 F.2d 323, 330–31 (D.C. Cir. 1979); *Southern Louisiana Area Rate Cases v. FPC*, 428 F.2d 407, 424 (5th Cir. 1970).

Accordingly, we affirm the Commission's approval of a 12.5% rate of return as a proper exercise of its administrative function.

### III

■ Natural's long-term debt is financed through 25-year debentures, some of which Natural reacquires before maturity in order to meet sinking fund requirements. Because current interest rates exceed the interest due on outstanding debentures, reacquisition is at a discount from face value and generates gain to Natural.

In calculating the cost rate for long-term debt, Staff first amortized any gains realized over the remaining life of the particular debentures repurchased. This amortization amount, allocated to the test period, 1978 and 1979, was then subtracted from the test period interest expense in order to determine the cost of debt. Staff used the amount of gain for the test period generated by debentures reacquired from 1953 through the test years pursuant to the ratemaking principle announced in *The Manufacturers Light and Heat Co.*, Opinion No. 583, 44 F.P.C. 314 (1970). Supply's witnesses credited the cost rate only for amortization amounts allocated to the test years for gains realized by reacquisitions since January 1, 1974, relying on the Commission's rulemaking in *Accounting for Premium, Discount and Expense of Issue, Gains and Losses on Refunding and Reacquisition of Long-Term Debt, and Interperiod Allocation of Income Taxes*, Order No. 505, 51 F.P.C. 714 (1974) (*as amended by* Order No. 505–A, 51 F.P.C. 832 (1974)). The ALJ found that *Manufacturers* established the appropriate ratemaking procedure and that

Order No. 505 was irrelevant because it merely prescribed the accounting treatment for gains or losses on reacquired debt. The Commission affirmed.

In *Manufacturers*, the Commission addressed for the first time "the treatment of discounts obtained in repurchase of debt to meet sinking fund requirements." 44 F.P.C. at 322. The Commission concluded that since consumers pay the cost of debt, gains realized in repurchasing the debt should be passed on to them. The accounting practice of crediting the gains to income in the year the debt was reacquired and retired, *id.* at 325, would not pass on the benefit to consumers. Therefore, the Commission adopted the ratemaking principle that all discounts and redemption premiums should be amortized over the remaining life of the debt being retired. In *Manufacturers*, the Commission credited long-term debt for reacquisitions from 1956 to the test years. *Id.* at 325–26, 330–31. In addition, the Commission explicitly held that its announced principle would be applicable to all pending and future rate filings. *Id.* at 326.

The Commission reaffirmed *Manufacturers'* significant ratemaking principle in Order No. 505, effective January 1, 1974. The Commission ordered that accounting and reporting practice should thereafter conform with that ratemaking policy because investors otherwise would look to distorted financial statements. 51 F.P.C. at 715. Order No. 505 consequently required that gains realized upon reacquisition of debt now be amortized over the remaining life of the particular repurchased debenture for both ratemaking and accounting purposes.

■ Supply contends that requiring amortization of gains realized by reacquisitions from 1953 instead of from 1974 is retroactive ratemaking because Supply now must adjust downwards its debt cost, thereby reducing its current rates, for events occurring prior to the effective date of the ordered accounting changes—January 1, 1974. We first note that an item may be treated differently for accounting than for ratemaking purposes. *Public Systems v. FERC,*

606 F.2d 973 (D.C.Cir. 1979). Second, we find that *Manufacturers*, decided in 1970, mandates that Supply amortize gains realized by reacquisitions from 1953. The Commission first addressed the amortization problem at that time [10] and immediately issued a clear directive. Order No. 505 merely conformed accounting practice to *Manufacturers'* ratemaking practice. Third, while *Manufacturers'* method does look to past events, that is done as a basis for calculating present costs as evidenced by allocation of only a portion of the gains realized to the test period. Past rates are not altered. Fourth, Supply undoubtedly knew of the decision in *Manufacturers*, it participated as a respondent in Order No. 505, 51 F.P.C. at 753, and the *Manufacturers* ratemaking principle has, in fact, been applied in prior Supply rate proceedings. *See Consolidated Gas Supply Corp.*, 52 F.P.C. at 505 & n.11. Supply was on notice as to how its gains from reacquired debt would be treated in these dockets. Therefore, we hold that the Commission properly decided this issue.

*AFFIRMED.*

---

10. Before the late 1960's and early 1970's when interest rates began to rise substantially above the rates at which debentures had been issued, the problem of how to treat gains realized upon reacquisition simply would not have arisen.