**CONSOLIDATED GAS SUPPLY CORPORATION, Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Public Service Commission of State of New York, Intervenor.**

**CONSOLIDATED GAS SUPPLY CORPORATION, Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Public Service Commission of West Virginia, Intervenor/P.**

**Nos. 79–1546(L), 83–1499.**

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1984.

Decided Sept. 24, 1984.

Rehearing and Rehearing In Banc Denied Oct. 31, 1984.

John E. Holtzinger, Jr., Washington, D.C. (John T. Stough, Jr., Kevin J. Lipson, Morgan, Lewis & Bockius, David E. Weatherwax, Stephen E. Williams, Washington, D.C., on brief), for petitioner.

Thomas E. Hirsch III, Washington, D.C., (Stephen R. Melton, Acting Gen. Counsel, Jerome M. Feit, Sol., Washington, D.C., on brief), for respondent.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Despite a commonly displayed attitude that focuses on the role of persons sitting on the bench, *i.e.*, judges, arbitrators or agency adjudicators, those persons are by no means the only ones to take decisions in litigated matters. On the contrary, resolution is not infrequently accomplished by the party litigants themselves through agreement and settlement before, during or even after litigation. In the achievement of such settlement, the parties are, or should be, encouraged. For a long time it has been a commonplace of those charged with resolving disputes that *interest reipublicae ut sit finis litium.*

As in most legal undertakings, precision of meaning, which fosters in turn a need for precision of language, has proven essential to the achievement of settlement. Otherwise, a case that has been compromised with the intention that it be permanently interred is apt, following a change of circumstances, to undergo a full-scale resurrection. In large measure, people remain litigious, and many are not averse to seizing any second chance they think may be open to them, if it means an opportunity for better results. The desire to ensure that there will be no disturbance of R.I.P. status for settled cases has led to colorful language in releases and other settlement documents, acknowledging, as they not infrequently do, the abandonment of claims "from the beginning of the world until the date hereof," when a more modest reference back to 1492, 1066 or even 476 would probably ensure sufficient protection.

Of course, the prospect of a settlement's coming undone is manifestly less when it has been entered under circumstances that

prevent the parties from ever learning what the eventual result of full litigation would have been. Such is the case, for example, in countless vehicle accident suits, for settlement in such instances usually eliminates any basis for determining what the judge or jury would have decided as to the issue of fault, or as to the amount of appropriate damages.

There are, however, occasions upon which the wish to purchase peace is compelling enough for the parties to compromise claims that are related to other collateral, ongoing disputes that will ultimately, despite any settlement, be resolved one way or the other. Such resolution will disclose which of the settling parties was abstractly right, which would win or lose, and hence which will have gained by settling and which will have lost.[1] Nevertheless, in return for other advantages a party may be willing to give up the fight with respect to a particular collateral, as yet undecided issue, as its resolution would affect the question directly at hand.

■ The case now before us presents such an ongoing, collateral matter and a settlement that the parties mutually agree did finally dispose of a number of contested issues. The question confronting us is whether general language in the settlement documents likewise extended to one crucial, contested issue, or whether the language of settlement only controlled if one of the parties was victorious in the collateral matter. It is earnestly contended before this court that the issue that was apparently settled was actually intended by the parties to await further developments in the way of a decision in a collateral matter which, if favorable to one of the parties, would lead to further specialized negotiations or litigation. In short, we must decide whether the settlement was intended by the parties to be complete or only partial. It is, of course, elementary that an unambiguous document controls, unaffected by contentions of one of the parties that

1. This conclusion does not suggest that the party who gave up something by settling, when he might have done better by fighting to the bitter

end, is necessarily a loser. Time is often money, and relief from uncertainty too may have a value.

he, she or it meant something else. *See Skyline Corp. v. NLRB*, 613 F.2d 1328, 1334 (5th Cir.1980) (as a general rule, "a mistake by one party to an agreement, where it is not induced by acts of the other party, will not constitute grounds for relief") (citation omitted).

After that spate of generalities, we turn to the particular facts of the case before us. Consolidated Gas Supply Corp. ("CGS"), an interstate natural gas pipeline company, has had more than one occasion to lock horns with the Federal Energy Regulatory Commission ("FERC"), and no doubt will have other opportunities in the future to do so. Proper rates to be charged by CGS to its customers is the common focus of such disputes, with justness and reasonableness constituting the tests for allowable rates. *See* 15 U.S.C. §§ 717c(a) and 717d(a); and 15 U.S.C. § 3314. A consideration in a number of prior disputes has been the applicability of a FERC policy requiring a pipeline company such as CGS to structure resale prices based on the "cost of service method" for "old" gas, *i.e.*, the gas emanating from wells that have existed for some time.[2] The FERC's position, up until June 28, 1983, the date a decisive Supreme Court opinion appeared,[3] has been that computations should be made exclusively with reference to the actual costs associated with the opening and maintenance of wells producing "old" gas. Since the costs associated with producing gas from more recently developed wells are higher, the efforts of CGS (and doubtless of others in a similar position) have been directed at having a uniform area or nationwide approach to pricing gas,[4] regardless of whether in any

particular case the gas is "old" or "new." The resulting mix of "new" gas costs with those of "old" gas would in general produce higher gas prices.

The passage into law of the Natural Gas Policy Act of 1978 ("NGPA") (enacted November 9, 1978 and effective December 1, 1978), 15 U.S.C. §§ 3301 *et seq.*, presented a complicating factor. Prices under the NGPA were to be calculated on the basis of costs associated with all gas production, including both "old" gas and "new." *See Public Service Commission of New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (5–4 decision) (1983). In respects here significant, the Supreme Court affirmed the substance of a decision of the Fifth Circuit rendered on December 23, 1981, which addressed this facet of NGPA pricing. In *Mid-Louisiana, vacating and remanding Mid-Louisiana Gas Co. v. FERC*, 664 F.2d 530 (5th Cir.1981), the Supreme Court held that the NGPA "maximum rates pricing" approach did apply to "old" gas produced by interstate pipelines. CGS was a party to the *Mid-Louisiana* case.

During the interval between November 9, 1978 and June 28, 1983, however, the FERC maintained the position that a "cost of service" approach, measured by the actual costs of producing the "old" gas, should continue to be used in the case of most sales by interstate pipelines despite the enactment of NGPA. *See* FERC Orders No. 58, 44 Fed.Reg. 66,577 (issued Nov. 14, 1979); No. 98, 45 Fed.Reg. 53,091 (issued Aug. 4, 1980), and No. 102, 45 Fed.Reg. 67,083 (issued Oct. 3, 1980).[5] The

---

2. "Old gas" has been defined as production from wells drilled before January 1, 1973 on leases acquired before October 8, 1969. *See Pipeline Production Area Rate Proceeding (Phase I)*, 42 F.P.C. 738, 745 (1969), *aff'd sub nom., City of Chicago v. FPC*, 458 F.2d 731 (D.C.Cir.1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

3. *Public Service Comm'n of New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983).

4. Such an approach would allow interstate pipeline companies like CGS to charge those rates that independent producers are permitted to charge for sales of comparable gas.

5. Specifically, Order No. 98, 45 Fed.Reg. 53,091 (issued Aug. 4, 1980) provided that "sales of natural gas by pipelines or distributors are not first sales, and thus not subject to NGPA prices, unless the gas is comprised exclusively of production volumes of natural gas from identifiable wells, properties or reservoirs that are owned by the pipeline or distributor. Therefore, sales of volumes of interstate pipeline pro-

administrative dream was not finally shattered until the Supreme Court rendered its decision on June 28, 1983. Under the circumstances, however, as to *open* matters, the FERC had already regarded itself as "obligated to implement the mandate" of the Court of Appeals for the Fifth Circuit, and had commenced prospective application of the *Mid-Louisiana* decision even while review in the Supreme Court was pending.[6]

Against that background, we must divine the parties' intent when they entered two settlements, one developed under Docket No. RP79–22 (consolidated with other docket items) and addressing pricing for the period December 1, 1978 through June 30, 1980, and the other Docket No. RP80–61 dealing with pricing for the period from July 1, 1980 through December 31, 1981. We note that CGS applied on December 29, 1978 for general rate increases, seeking application of the NGPA pricing approach ultimately validated in *Mid-Louisiana.* Anticipating FERC rejection, however, CGS also submitted an alternate tariff sheet figured on the basis of the "cost of service" method, *i.e.*, the one that used "old" costs in pricing production. The FERC rejected the new approach, and opted instead for the tariff sheet reflecting the "cost of service" approach.

A settlement of seven pending rate cases and one certificate case was proposed by CGS on June 22, 1979. It suggested that the proceedings regarding pricing for pipeline production be terminated without prejudice to the right of any party to seek rehearing and court review of the applicability of the NGPA approach.[7] The tariff sheet employing the "all production" approach based on the NGPA was rejected by the FERC in its letter order of August 2, 1979, and instead the alternate tariff sheet with pricing on the "cost of service" basis was accepted. The settlement agreement was certified to the FERC by CGS on August 16, 1979 and was approved by the FERC on November 16, 1979.[8] CGS' application for rehearing on the NGPA pricing issue was formally denied on November 19, 1980, after the FERC had promulgated formal regulations excluding much of "old" pipeline production from NGPA pricing. Following the August 2, 1979 letter order rejecting NGPA pricing, CGS had exercised its explicitly reserved right to take the matter to court, thereby raising, as Docket No. 79–1546, one of the controversies we here undertake to resolve.

The next relevant step in litigation was CGS' filing on July 30, 1982 of a proposed tariff change related to the purchased gas cost adjustment permitted in its tariff.[9] The objective was to obtain *Mid-Louisiana* treatment retroactively, for purposes of determining maximum lawful prices. On August 31, 1982, *i.e.*, after the Fifth Circuit decision in *Mid-Louisiana* but prior to the Supreme Court ruling, the FERC did order the filing of CGS proposed tariff sheets,

duction that are commingled with purchased gas prior to sale remain subject to ["old" gas pricing]."

**6.** Accordingly, for periods after December 31, 1981, *i.e.*, a date almost immediately after the Fifth Circuit decision in *Mid-Louisiana,* the FERC allowed CGS to employ NGPA "maximum cost" pricing, but provided that the pricing would be subject to refund should *Mid-Louisiana* be reversed or modified by the Supreme Court. *See generally Consolidated Gas Supply Corp.*, 22 F.E.R.C. (CCH) ¶ 61,120 at 61,182 n. 4 (Feb. 4, 1983).

**7.** Article V of the "Stipulation and Agreement" provided:

The treatment of pipeline production in Docket Nos. RP78–52 and RP79–22 shall be an issue reserved for hearing and Commission decision which decision shall be made on the basis of the hearing record or any subsequent settlement agreement.... This agreement to reserve the pipeline production issue in Docket Nos. RP78–52 and RP79–22 shall not affect any party's right to seek rehearing, stay, and court review as to the applicability of the NGPA to such production and the validity of the Commission's rules, regulations, and orders thereunder.

**8.** The rates proposed in RP79–22 became effective July 1, 1979.

**9.** 18 C.F.R. § 154.38(d)(4) (1983) provides that "[a] natural gas pipeline company may flow through changes in its cost of purchased gas pursuant to a purchased gas adjustment clause (PGA clause)," with such charges recovered separately from general rate charges.

permitting them to become effective September 1, 1982, but subject to refund. A surcharge over a three-year period was proposed by CGS, to permit it to recover the differences that accrued during the December 1, 1978 through December 31, 1981 period, between what NGPA pricing would have yielded and what the "cost of service" method had actually produced. The FERC's acceptance of the proposed surcharge was made subject to the outcome of another proceeding (Docket No. RP82–64–000) in which CGS initially sought and, again subject to possible refund, obtained prospective application of NGPA pricing for "old" pipeline production. *See generally Consolidated Gas Supply Corp.*, 22 F.E.R.C. (CCH) ¶ 61,120 at 61,179 (Feb. 4, 1983).

■ Despite these multiple filings and carefully constructed proposals, however, on February 4, 1983 the FERC acted on its own accord to modify the order of August 31, 1982.[10] It directed that the impact of settlement agreements entered between CGS and the FERC for the periods a) July 1, 1978 through June 30, 1980 and b) July 1, 1980 through December 31, 1981 be taken into account.[11] The settlement agreement for December 1, 1978 through June 30, 1980 was recognized by the FERC as having preserved the right of CGS "to make retroactive collection of [NGPA] costs...." *Id.* at 61,181. Hence, subject to further proceedings in *Mid-Louisiana* designed to ascertain the trigger-point for NGPA pricing along the gas marketing system, the decision by the FERC with respect to the period December 1, 1978 through June 30, 1980 was favorable to CGS and is affirmed by us.

By contrast, there were substantial differences in the language appearing in the settlement agreement covering the period July 1, 1980 through December 31, 1981, which differences led the FERC to conclude that no reservation of "any right to assert NGPA treatment for pipeline production" had been made in that settlement. *Id.* Thus, the FERC's modifying order of February 4, 1983 denied to CGS the right retroactively to use NGPA pricing for the time span between July 1, 1980 and December 31, 1981.[12]

The practice has not been uncommon for a pipeline company and the FERC to negotiate a settlement once a rate increase request has been set for hearing. When such a settlement has been reached between the company and the FERC staff, it must still win the approval of the Commission itself, which approval is granted only after an opportunity for comment has been afforded to interested persons. To gain final approval, the Commission must be satisfied that it is "fair and reasonable and in the public interest." 18 C.F.R. § 385.-602(g)(3) (1983).

■ As noted above, the document embodying the settlement covering the period between December 1, 1978 and June 30, 1980, RP79–22, was forwarded to the FERC by counsel for CGS by letter dated June 22, 1979, and became effective with formal FERC approval on November 16, 1979. The significance of the earlier RP79–22 settlement agreement lies in the clear specificity with which CGS reserved its right to seek relief, at a future time (no doubt dependent on the ultimate outcome of *Mid-Louisiana*), through application of the NGPA "all cost" approach to transactions occurring between December 1, 1978 and June 30, 1980.[13] Before this court, the

---

**10.** *Consolidated Gas Supply Corp.*, 22 F.E.R.C. (CCH) ¶ 61,120 (Feb. 4, 1983).

**11.** Although the relevant dates were initially misstated in the FERC's ruling of February 4, 1983, the errors were corrected by subsequent modification. *See Consolidated Gas Supply Corp.*, 23 F.E.R.C. (CCH) ¶ 61,018 at 61,047 (Apr. 6, 1983).

**12.** The February 4, 1983 order, as modified on April 6, 1983, was assigned Docket No. 83–1499 on appeal by CGS to this court.

**13.** In Article V of the RP79–22 settlement, termed "Pipeline Production," it was provided that all pre-1978 dockets were declared terminated, and CGS' request for relief as to them was withdrawn. However, for RP79–22, it was made clear that treatment of pipeline production:

FERC has relied on language differences in the second settlement agreement covering July 1, 1980 through December 31, 1981 (Docket No. RP80–61), which it contends dictate the application of a general principle that broad changes in phraseology signify differences in meaning.[14] While as a generality that may be true, the possibility also exists that alterations in the circumstances that are addressed, or a simple desire to demonstrate versatility in expressing the same idea—not a variation in intent—may underlie changes in the words employed.

On January 30, 1980 the FERC ordered that "costs of old pipeline production should be based on cost of service...." *See generally Consolidated Gas Supply Corp.*, 22 F.E.R.C. ¶ 61,120 at 61,181 (Feb. 4, 1983). The order rejected the tariff sheet submitted by CGS that sought to apply NGPA pricing for pipeline production. A settlement agreement in RP80–61, governing the period between July 1, 1980 and December 31, 1981, was filed on February 6, 1981, certified to the FERC on March 5, 1981, and approved by the Commission on April 3, 1981.[15] *See Consolidated Gas Supply Corp.*, 15 F.E.R.C.

(CCH) ¶ 61,006 (Apr. 3, 1981). The FERC later specifically determined that the rejection of NGPA pricing had not been appealed by CGS, nor had the issue been reserved by the settlement agreement. *See Consolidated Gas Supply Corp.*, 22 F.E.R.C. (CCH) ¶ 61,120 at 61,181 (Feb. 4, 1983).

Formal approval of the settlement agreement accordingly was after the *Mid-Louisiana* case had first been instituted in the Fourth Circuit on October 6, 1980, and transferred to the Fifth Circuit on December 2, 1980, but prior to the December 23, 1981 decision by the Fifth Circuit and *a fortiori* before the Supreme Court spoke on June 28, 1983. The RP80–61 settlement agreement, therefore, was negotiated while the applicability of the NGPA pricing method to "old" gas was very much in dispute and hotly contested by the parties.

A direct comparison of specific sections of the settlement agreements in Docket Nos. RP79–22 and 80–61 serves to illuminate the meaning of both. The "Stipulation and Agreement" covering Docket No. RP79–22 and associated docket items for the period December 1, 1978 through June 30, 1980 commenced with the statement

shall be an issue reserved for hearing and Commission decision which decision shall be made on the basis of the hearing record or any subsequent settlement agreement.... This agreement to reserve the pipeline production issue in Docket Nos. RP78–52 and RP79–22 shall not affect any party's right to seek rehearing, stay, and court review as to the applicability of the NGPA to such production and the validity of the Commission's rules, regulations, and orders thereunder.

**14.** It is not to be ignored that careful, explicit language of reservation is to be found throughout RP79–22, the earlier-prepared and submitted settlement agreement. The absence of similar language in the later RP80–61 settlement is more damaging to the position of CGS than if the two agreements had been chronologically reversed. Such is particularly the case when it is realized that, in two other subsequent settlement agreements, RP81–80 and RP82–115, CGS went to considerable pains to make explicit the reservation of its right to claim NGPA pricing for the periods there involved.

**15.** It is enough to suggest massive failure of communication on the part of several different

lawyers for CGS to learn that on January 30, 1981, seven days before the filing of the RP80–61 settlement agreement, a PGA rate change filing was made in Docket No. TA81–1–22–002, with a transmittal letter that included the following language:

The filing in this [PGA] proceeding on the basis of the inclusion of old pipeline production on a cost-of-service basis is without prejudice to Consolidated's position that old pipeline production is entitled to NGPA treatment and the outcome of the court proceedings. Consolidated has omitted [an] alternate filing to avoid the burden of Commission rejection of a tariff sheet, to be followed by another application for rehearing and petition for court review. Consolidated reserves the right to make collections based on NGPA treatment for old pipeline production.

It cannot be disputed, however, that the language we are construing in RP80–61 is that of a subsequently filed, integrated agreement, not that appearing in an earlier document filed in a different connection. If a lawyer's lapse has placed CGS in its present position, that does not justify our departure from established tenets of contract construction, tenets with which the lawyer must have been familiar.

that the intent was to resolve "all of the issues now pending" in the rate proceedings in certain of the docket items other than RP79–22 (all of which antedated the enactment of the NGPA), as well as "certain limited issues" in RP79–22. On the other hand, the RP80–61 "Stipulation and Agreement Resolving Cost of Service and PGA Issues" was not similarly restricted. It expressed the intent as "resolution of all of the cost of service issues and the PGA issues ... in Docket No. RP80–61...." Thus, at the outset, the earlier agreement spoke in terms of resolution of only "certain limited issues," while the later one, the interpretation of which has fallen to our lot, described its mission as resolution of "*all* of the cost of service issues." [16] (Emphasis supplied).

Subsequently, however, in the section headed "Procedural Background," RP80–61 states that "the participants have reached this unanimous Stipulation and Agreement which resolves cost of service and purchased gas adjustment clause issues, except for certain reserved issues *as specified in this agreement*." [17] (Emphasis supplied). We must, perforce, address the question whether the reservations "specified" or "contained" in the RP80–61 settlement agreement include the right retroactively to seek NGPA maximum pricing after *Mid-Louisiana* had been finally decided.

We find that the pricing technique employed in the RP80–61 settlement agreement is the "cost of service" approach favored by the FERC. Nowhere in the RP80–61 settlement agreement does reservation language specific to NGPA pricing appear. As the FERC in its "Order Modifying Prior Commission Order" of February 4, 1983 has observed, the pipeline production pricing issue is not addressed at all in the body of the settlement agreement. In fact, it appears that "the rates in the settlement agreement were supported by various costs, including costs associated with the valuation of Consolidated's old production on a cost-of-service basis." *Consolidated Gas Supply Corp.*, 23 F.E.R.C. ¶ 61,018 at 61,047 (Apr. 6, 1983). Since the proper pricing of "old" gas was a crucial issue in RP80–61, any reservation of rights should have been specifically enunciated in the settlement.

■ In this regard, CGS freely admits in its Reply Brief that "[d]uring the term covered by the 1980 rate case settlement, however, Consolidated did value its pipeline production on a cost of service basis, but only because the Commission required it to do so." Also, in light of the developed positions taken at the time by the FERC on the one hand and by pipeline companies on the other, the FERC could hardly have operated on any other assumption. Indeed,

**16.** CGS makes an argument based on acknowledgments by the FERC in two documents issued in 1979 that CGS could, should it ultimately prevail in *Mid-Louisiana,* collect through surcharges differentials in past pricing between "cost of service" and NGPA pipeline production techniques. The latter of those two acknowledgments occurred on June 29, 1979. Over a year and one-half later came the RP80–61 settlement agreement. It resolved "all of the cost of service issues," and whether "old" gas should be priced on a "cost of service" basis certainly was a continuing, unresolved issue between the parties. By representing in 1979 that the issue was still generally open, and by agreeing in 1981 that, as to a fixed segment of the time frame involved, it was resolved, the FERC was filling a classic role in dispute resolution.

In like vein, CGS points to language in its December 28, 1979 rate filing in RP80–61, which read:

> Consolidated is filing the proposed tariff sheets consistent with its position that all pipeline production qualifies for pricing at NGPA rates and the alternative tariff sheets consistent with Consolidated's understanding of Commission policy that only pipeline production previously priced the same as independent producer production qualifies for pricing at NGPA rates.

Again, that language constitutes only a preliminary to the integrated contract that came into being with final Commission approval on April 3, 1981. The making of the point earlier, only to exclude it later from the agreement itself, cuts against the position of CGS rather than supports it.

**17.** Subsequently, under the heading "Cost of Service" (Article II), there is reference to rates set forth in the settlement agreement to be effective July 1, 1980 through March 31, 1981, "subject to the reservations contained herein...."

pricing under the settlement agreement must have proceeded on the "cost of service" basis, or else there would have been no occasion for the lawsuit to have been instituted. It follows rather inexorably that such a "cost of service" issue was pending before the FERC and was intended to be resolved by the very introductory language of the RP80–61 settlement agreement.[18] Out of "all of the cost of service issues" the settlement purported to cover, NGPA pricing unmistakably was one.

The text of the settlement in RP80–61 itself reveals that CGS well knew how to make explicit reservations regarding selected issues, but that the subject of NGPA prices was not one of the issues so selected. Article III of the agreement, captioned "Rate of Return," called for application of a rate of return on common equity to be determined in *Consolidated Gas Supply Corp. v. FERC*, 4th Cir. No. 80–1219, then pending with respect to the rate of return decided by the FERC to be effective with respect to the tariffs at issue in RP79–22. *See Consolidated Gas Supply Corp. v. FERC*, 653 F.2d 129 (4th Cir.1981). Article IV, titled "HIOS Separation Charges,"[19] speaks of components of the HIOS transportation rates and explicitly stipulates that the "issue be reserved and tied to the outcome of a similar issue in ... Docket No. RP78–94 ...."

In addition, Article VI of the RP80–61 agreement speaks of a cost allocation agreement as having been unanimously settled, and simultaneously filed, which, upon approval, would resolve GSS and SSO[20] cost allocation issues in RP80–61. Upon subsequent "approv[al] in its entirety by the Commission," the matter was finally disposed of and settled, with no reservation "specified" or "contained." The RP79–22 settlement agreement, on the other hand, demonstrated an appreciation of how to deal with an unresolved issue, for it had specifically "reserved for later settlement or decision" the GSS and SSO rate schedules of CGS. By way of emphasis, the RP79–22 settlement agreement continues, "Nothing in this Stipulation and Agree-

---

**18.** As an "aid" to interpretation of the mutually negotiated settlement agreement, CGS points to its treatment of PGA applications. One submitted on February 4, 1980 (effective by Commission approval on March 1, 1980) had contained no reservation of the right to claim any entitlement to NGPA pricing. However, the settlement already long since approved in RP79–22 did reserve the right to claim NGPA prices for the period March 1, 1980 through June 30, 1980. CGS naturally has no quarrel with that result, and is satisfied to accept the operation of the explicit language of reservation in the RP79–22 settlement governing the period.

Two subsequent PGA applications on August 1, 1980 (effective September 1, 1980) and January 30, 1981 (effective March 1, 1981) related to a period after that covered by the settlement in RP79–22. CGS then did assert in its transmittal letters that the use of the "cost of service" approach was without prejudice to its right to claim NGPA pricing. The applications do not, however, dictate the agreement. Otherwise, there would simply be no negotiations, and the gas pipeline companies would have it all their own way. Unlike the *settlement* in RP79–22, the settlement ultimately approved in RP80–61—*i.e.,* the operative *agreement*—plainly did not include language of reservation on the cost of service issue. While CGS is no doubt dissatisfied at this point to accept the operation of the terms of settlement finally adopted in RP80–61,

such must be the result. CGS may not claim that the earlier, unilateral statements made in letters of transmittal control the language ultimately adopted in the RP80–61 settlement document itself. Indeed, it seems questionable how CGS is helped by these examples, for the settlement approved on April 3, 1981 in RP80–61 did not contain a reservation that CGS twice previously (within the past eight months) had demonstrated that it knew how to articulate.

In short, unilateral statements of position uttered before an integrated contract is entered do not become part of a contract when the party arguing for their inclusion was unable to secure the adoption of the statements in the language of the contract. *See G.J. Langenderfer v. Midrex Corp.,* 660 F.2d 523, 525 (4th Cir.1981) ("parol evidence cannot be admitted to establish a provision nowhere present in the contract"); *Kawa Leasing, Ltd. v. Yacht Sequoia,* 544 F.Supp. 1050, 1066 (D.Md.1982) (parol evidence rule proscribes the admission of oral evidence when parties have intended that a written agreement cover all the subjects of their negotiations); and *Restatement (Second) of Contracts* § 213 (1979).

**19.** "HIOS" refers to the High Island Offshore System, a natural gas pipeline located in the Gulf of Mexico area.

**20.** "GSS" and "SSO" refer to General Storage Service and Storage Service performed by CGS.

ment will dispose of any of the issues in Docket No. 79–22 related to the GSS and SSO rates."

"PGA Clause Modification" was a topic afforded a separate article designation in both agreements. In RP79–22, after a provision for separate treatment of demand and commodity costs of pipeline supplier gas purchases, there is an explicit reservation to the effect that the proper accounting for the cost of gas withdrawn from storage in determining unrecovered purchase gas costs should "be reserved for later determination." In RP80–61, on the other hand, the "unit of sales" approach is adopted for ascertaining the recovery of purchased gas costs. Nothing is reserved for subsequent determination.

By the same token, "Storage Accounting," a subject addressed in Article VIII of the RP80–61 settlement agreement, explicitly reserved certain cost issues for subsequent disposition by settlement or additional hearings in Docket RP80–61. Specifically, subsequent settlement or hearings would dictate the proper value of gas in storage inventory to be used in determining the working capital allowance underlying the costs of service.

An article entitled "Reservations," though differing in some apparently immaterial respects, was common both to the RP79–22 and the RP80–61 settlement agreements. Each emphasized that it confined itself to the specific issues in each case, and that the agreement did not, for any party, represent acceptance for other purposes (especially for other time periods) of any theory, principle or data underlying the settlement agreement. Both settlement agreements stated that "neither [CGS] nor [the FERC], its Staff, or any other party to these proceedings shall be deemed to have waived any claim or right which it may otherwise have with respect

to any matters not expressly provided for herein."

■ Thus, having compared the two agreements, it is impossible to conclude that they mean the same thing and have the same effect insofar as a) allowing retroactive gas pricing at the NGPA level and b) permitting surcharges to effect collection. CGS clearly exhibited its awareness of how to put a matter finally to rest and, equally, of how to reserve issues. It made explicit and effective reservations in the RP80–61 settlement agreement (*e.g.*, insofar as "Rate of Return" and "HIOS Separation Charges" are concerned). It did not, however, include any language in RP80–61 to reserve the issue of NGPA "all production" pricing, even though it had done so in the earlier settlement. While in the RP80–61 settlement agreement CGS made generalized reference to reservations "specified" or "contained" therein, one searches in vain for the reservation concerning NGPA pricing that CGS suggests is there "by implication." [21]

Indeed, the opposite conclusion must be drawn. As noted above, the agreement describes as its function the resolution of "*all* of the cost of service issues." (Emphasis supplied). In stark contrast, the RP79–22 settlement agreement first explicitly reserves the pricing issue, then makes clear that only "certain limited issues" are settled. As outlined above, a detailed comparison of the subsequent provisions of the two documents further bolsters the conclusion that NGPA pricing was not an issue reserved by the settlement in RP80–61. The generalized reservation to the specific issues in the case and the non-disposition for other purposes of any "theory, principle or data" simply do not stand up against the particularized statement that the parties contemplated resolution of "all of the cost of service issues." [22] NGPA pricing versus

---

**21.** There are other strained attempts to find support for the position of CGS that are so obscure (*e.g.*, the language of note 3 in Fifth Revised Sheet No. 68 attached as part of Appendix C, and issued on October 31, 1980, *i.e.*, over three months before the RP80–61 settlement

agreement was filed by CGS) as not to require specific consideration and refutation.

**22.** We pass without belaboring the question of why, if the generalized reservation had the excessively broad scope of meaning now asserted for it by CGS, it was necessary in the RP79–22

the cost of service approach was an issue, and a hotly contested one.

■ Settlement of disputes involves mutual agreement, binding on both parties. CGS seeks to have things both ways, abiding by RP80–61 when the provisions are satisfactory to it, but seeking to shed a provision of importance to the FERC although the agreement contained no reservation. It is precisely a reservation that would be required if CGS were successfully to follow such a course.

■ Although the contrast between the RP79–22 and the RP80–61 settlement agreements makes our conclusion all the more inescapable, it is worth noting that the language of the RP80–61 agreement standing alone was probably enough to support that result. It is a reasonable interpretation device to conclude that what someone has not said, someone has not meant. In the succinct words of Judge John R. Brown in *Texas Eastern Transmission Corp. v. Federal Power Commission*, 306 F.2d 345, 348 (5th Cir.1962), *cert. denied sub nom. Manufacturer's Light & Heat Co. v. Texas Eastern Transmission Corp.*, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963), "[O]ne sure way to discourage voluntary settlements is ... to read into contracts things which are simply not expressed or not there.... [The contract] should stand for what it says."

■ Moreover, and quite significantly, the FERC similarly interpreted the agreement, and interpretation by the federal agency concerned is entitled to deference.[23]

We do not mean to infer that a court need accept an agency interpretation that black means white.[24] However, if the choice lies between dark grey and light grey, the conclusion of the agency, unmistakably possessed as it is of special expertise, in favor of one or the other will have great weight. Furthermore, independently of agency expertise in the present case, and purely as a matter of contract interpretation common to many areas of legal endeavor,[25] we reach the same conclusion as has the FERC as to the meaning of the RP80–61 agreement. Hence we have no occasion to retreat behind agency deference, though, were we to do so, it would only reinforce the result reached on a more direct and lawyerlike basis.

The FERC has read the RP79–22 settlement agreement as preserving to CGS the right to secure NGPA "all cost" pricing for the period December 1, 1978 through June 30, 1980. As to that decision CGS has no complaint. As for the RP80–61 settlement agreement, when it is placed side by side with the RP79–22 document, the reservation in one and the lack of reservation in . the other spring forth and compel the conclusion that the hope of NGPA pricing for the July 1, 1980 through December 31, 1981 period had been discarded by CGS, presumably in return for another benefit or other benefits. CGS would hardly have entered the RP80–61 settlement agreement unless it were perceived as benefitting CGS in one or more respects. Moreover, it hardly would have entered an agreement in-

settlement agreement to insert so explicit a reservation of the NGPA pricing right.

**23.** *See Coca-Cola Co. v. Atchison, Topeka, and Santa Fe Ry. Co.,* 608 F.2d 213, 222 (5th Cir. 1979) ("even where the issue is one of ... interpretation of contracts, tariffs, regulations and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry"); and *Consolidated Gas Supply Corp. v. FERC,* 653 F.2d at 133:

Our role in reviewing the Commission's decision is narrow. Section 19(b) of the Natural Gas Act provides that Commission findings "if supported by substantial evidence, shall be

conclusive." 15 U.S.C. § 717r(b). In addition, we must defer to the Commission's regulatory expertise.

**24.** For example, an attempted construction of the RP79–22 settlement agreement by the FERC as not reserving to CGS the right to pursue NGPA pricing for the December 1, 1978 through June 30, 1980 period could hardly prevail.

**25.** *See Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 268–70, 80 S.Ct. 1122, 1125–27, 4 L.Ed.2d 1208 (1960) (Supreme Court reviews a decision of the Federal Power Commission based upon "canons of contract construction employed by the courts").

tending to reserve the NGPA pricing issue without saying so. Accordingly, having reviewed the FERC orders under attack, we are of the definite opinion that both should be

AFFIRMED.